1

2

3

4          **UNITED STATES DISTRICT COURT**

5          **DISTRICT OF NEVADA**

6

7   GYPSUM RESOURCES, LLC,                    )
                                              )
8               Plaintiff,                    )
                                              )          2:05-cv-00583-RCJ-LRL
9          vs.                                )
                                              )
10  CATHERINE CORTEZ MASTO et al.,            )          **ORDER**
                                              )
11                                            )
                Defendants.                   )
12  _____  )

13

14          Plaintiff in this case is property owner Gypsum Resources, LLC ("Gypsum"), a Nevada

15  limited liability company.  Defendants are Clark County District Attorney David Roger, the County

16  of Clark (the "County"), the Board of County Commissioners of the County of Clark (the "Board"),

17  (collectively, the "County Defendants"), and Nevada Attorney General Catherine Cortez Masto.

18  Plaintiff sued Defendants, asking the Court to declare Nevada Senate Bill No. 358 ("SB 358") and

19  Clark County Ordinance No. 2914 ("CCO 2914") unconstitutional under the United States

20  Constitution and the Nevada Constitution. (#1).  Pending before the Court are three motions.  The

21  first motion is Plaintiff's Motion for Summary Judgment (#42) on Causes of Action Four and Five.

22  The County Defendants have filed a Response (#55), Attorney General Masto has filed a Response

23  (#56), and Plaintiff has filed a Reply (#67).   The second and third motions are the County

24  Defendants' Motion for Summary Judgment (#43) and Errata (#50) to that motion, and Attorney

25  General Masto's Motion for Summary Judgment (#44).  Plaintiff has filed a Response (#57),

1   Declarations and Exhibits (#58), and Request for Judicial Notice (#59).  Attorney General Masto

2   has filed a Reply and Amended Reply (#64, #66), and the County Defendants have filed a Reply

3   (#65).

4        For the reasons given herein, the court grants Plaintiff's Motion for Summary Judgment

5   (#42) as to the Fourth and Fifth Causes of Action, denies Defendants' Motions for Summary

6   Judgment (#43, #44) as to the First Cause of Action, and grants Defendants' Motions for Summary

7   Judgment (#43, #44) as to the Second Cause of Action.

8   **I.    FACTS AND PROCEDURAL HISTORY**

9        Plaintiff owns real property (the "Gypsum Mine Property" or the "Property"), which consists

10  of 2400 acres that abut and, in some locations include, portions of the Red Rock Canyon National

11  Conservation Area ("RRCNCA").  The area was mined for gypsum in the 1920s and later, and it

12  bears the scars of that activity.  The land is located in Clark County approximately twelve miles west

13  of the Las Vegas Strip and is zoned as RU (rural), which allows for the development of residential

14  housing of one home on every two acres.  James Rhodes, on behalf of Gypsum, contracted to

15  purchase the Property in September 2002 for over $50 million, with the intent to develop it for both

16  residential and commercial uses.  The purchase was finalized in March 2003, and the Property was

17  subsequently transferred to Plaintiff.

18       In 2003, the Gypsum Mine Property drew the attention of local, state, and federal

19  lawmakers, who discussed the possibility of acquiring the property to expand the RRCNCA.

20  However, the Bureau of Land Management ("BLM") did not want to take responsibility for the

21  Gypsum Mine Property due to its damaged condition.  Clark County passed a resolution on May

22  6, 2003, supporting the fair market acquisition of the lands and transfer of title from the County

23  to BLM.

24       In the meantime, SB 358 was sponsored by State Senators Titus, Wiener, Care, Schneider,

25  and Coffin, *see* 2003 Nev. Stat. 595, to limit development, subdivision regulation, and rezoning in

1   an area (the "Adjacent Areas") that includes the Gypsum Mine Property.  SB 358 was passed by the

2   Nevada Legislature and signed into law by Governor Kenny Guinn on May 19, 2003.  It amended

3   several chapters of the Nevada Revised Statutes.  Section 11 gave SB 358 an effective date of July

4   1, 2003. *Id.* at 598.  The Act, in relevant part, prohibits local governments from approving a land use

5   application that would increase the number of residential dwelling units allowed by existing zoning

6   regulations within the Adjacent Areas, unless a trade of development credits was involved:

7        With respect to adjacent lands, a local government:

8        1.  Shall not, in regulating the use of those lands:

9        (a) Increase the number of residential dwelling units allowed by zoning regulations
         in existence on the effective date of this act, unless such an increase can be
10       accomplished, within a given area, by the trading of development credits or another
         mechanism that allows a greater number of residential dwelling units to be
11       constructed in that area without increasing the overall density of residential dwelling
         units in that area;

12

13   SB 358 § 8 (adding this text to Chapter 639, Statutes of Nevada, 1993 Nev. Stat. 2673, as

14   § 4.3(1)(a)).  The Act also prohibits the County from establishing new, non-residential zoning

15   districts on the affected lands or expanding the size of existing non-residential zoning districts:

16       With respect to adjacent lands, a local government:

17       1.  Shall not, in regulating the use of those lands:

18           . . . .

19       (b) Establish any new nonresidential zoning districts, other than for public facilities;
         or
20       (c) Expand the size of any nonresidential zoning district in existence on the effective
         date of this act, other than for public facilities.

21

22   *Id.* (adding this text to Chapter 639, Statutes of Nevada, 1993 Nev. Stat. 2673, as § 4.3(1)(b)–(c)).

23        Shortly thereafter, on May 21, 2003, the Board adopted CCO 2914, which imposes additional

24   design standards and density restrictions for development within and adjacent to the RRCNCA.

25   Virtually identical to SB 358 in many ways, CCO 2914 states that the County will not accept any

land use applications that would (1) increase residential densities unless a trade of development credits is involved, (2) establish new non-residential zoning districts, or (3) expand the size of existing non-residential zoning districts on the affected lands, including Plaintiff's Property.

Plaintiff contends that the local and state officials purposefully "sought to orchestrate a program that would eventually force Rhodes to sell the Gypsum Mine Property to the State at a price that was artificially depressed by a coordinated governmental effort." (#1 at 12, ¶ 24). Plaintiff believes his Property was singled out to create a buffer adjacent to the RRCNCA and that this is in conflict with the federal law creating the RRCNCA because the federal statute specifically stated that a buffer zone around the conservation area was unnecessary and unintended. *See* 16 U.S.C. § 460ccc-9.[1]

Plaintiff filed suit for declaratory and injunctive relief under the Civil Rights Act of 1991, 42 U.S.C. § 1983, and the Nevada Constitution against two groups of defendants: (1) the "State Defendants," including former Governor Kenny Guinn and former Nevada Attorney General Brian Sandoval; and (2) the County Defendants.[2] Plaintiff alleges that SB 358 and CCO 2914 are unconstitutional under the Fourteenth Amendment. Plaintiff also alleges state constitutional and statutory violations. Plaintiff seeks a declaration that these provisions are unconstitutional and an injunction against their enforcement. Plaintiff brought Equal Protection (Cause of Action 1), Due Process (Cause of Action 2), and Takings (Cause of Action 3) claims under 42 U.S.C. § 1983, as well as claims for violation of Sections 20 and 21 of Article 4 of the Nevada Constitution (Causes of Action 4 and 5) under 28 U.S.C. § 1367. Cause of Action 3 and the procedural due process claim of Cause of Action 2 have been dismissed. (#29 at 13:12).

---

[1]Plaintiff has not sued under the Supremacy Clause.

[2]Current Nevada Attorney General Catherine Cortez Masto has been substituted as a defendant in her official capacity for former Nevada Attorney General Brian Sandoval, and former Nevada Governor Kenny Guinn has been dismissed as a defendant. (#29 at 13:12–15).

1    **II.    SUMMARY JUDGMENT STANDARD**

2        The Federal Rules of Civil Procedure provide for summary adjudication when "the

3    pleadings, depositions, answers to interrogatories, and admissions on file, together with the

4    affidavits, if any, show that there is no genuine issue as to any material fact and that the party is

5    entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may

6    affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A

7    dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return

8    a verdict for the nonmoving party. *See id.*  A principal purpose of summary judgment is "to isolate

9    and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24

10   (1986).

11       In a summary judgment posture, the Court must consider the parties' respective burdens.

12   "When the party moving for summary judgment would bear the burden of proof at trial, it must

13   come forward with evidence which would entitle it to a directed verdict if the evidence went

14   uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the

15   absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co.*

16   *v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the

17   nonmoving party bears the burden of proving the claim or defense, the moving party can meet its

18   burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving

19   party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient

20   to establish an element essential to that party's case on which that party will bear the burden of proof

21   at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden,

22   summary judgment must be denied and the court need not consider the nonmoving party's evidence.

23   *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

24       If the moving party meets its initial responsibility, the burden then shifts to the opposing

25   party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita*

1  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a

2  factual dispute, the opposing party need not establish a material issue of fact conclusively in its

3  favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve

4  the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors*

5  *Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid

6  summary judgment by relying solely on conclusory allegations that are unsupported by factual data.

7  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the

8  assertions and allegations of the pleadings and set forth specific facts by producing competent

9  evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at

10  324.

11       When considering a summary judgment motion, the Court examines the pleadings,

12  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

13  Fed. R. Civ. P. 56(c).  At summary judgment, the judge's function is not to weigh the evidence and

14  determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477

15  U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to

16  be drawn in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely colorable

17  or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

18  **III.    ANALYSIS**

19       **A.    Cross Motions for Summary Judgment on Causes of Action 4 and 5**

20       Plaintiff has moved for summary judgment on Cause of Action 4 pursuant to Sections 20 and

21  21 of Article 4 of the Nevada Constitution and on Cause of Action 5 pursuant to Section 25.  The

22  Nevada Supreme Court has interpreted these sections.  Plaintiff attacks only SB 358 under these

23  provisions, not CCO 2914 (#1 at 31:8–24).

24       Plaintiff did not plead a violation of Section 25 in the Complaint. (#1).  The Complaint

25  pleads only sections 20 and 21 (#1 at 28:14).  Although Plaintiff has not moved to amend the

1   Complaint, and he cannot do so in his motion for summary judgment without leave, Defendants here

2   have long had notice of the relevant issues based on the Complaint, even if section 25 was not

3   explicitly pled, so the Court will grant leave to amend *sua sponte* and address Section 25.

         **1.**        **Cause of Action 4 (Nev. Const. art. 4, §§ 20–21)**

5          In 1935, the Washoe County Water Conservation District sued County Clerk and ex-officio

6   Clerk of the Board of County Commissioners Elwood H. Beemer when he refused to cause certain

7   bonds to be printed and signed on the ground that the state legislation purporting to authorize them

8   violated several provisions of the Nevada Constitution. *Washoe County Water Conservation Dist.*

9   *v. Beemer*, 45 P.2d 779, 780 (Nev. 1935).  Beemer argued that the law violated Sections 20 and 21

10  of Article 4. *Id.* at 782.  Those sections read today as they read in 1935:

> Section 20.  Certain local and special laws prohibited.  The legislature shall not pass
> local or special laws in any of the following enumerated cases—that is to say:
>
>    . . . .
>
> Regulating county and township business;
>
>    . . . .
>
> Sec: 21.  General laws to have uniform application. In all cases enumerated in the
> preceding section, and in all other cases where a general law can be made applicable,
> all laws shall be general and of uniform operation throughout the State.

Nev. Const. art.4, §§ 20–21, *available at* http://www.leg.state.nv.us/Const/NVConst.html.  The

*Beemer* Court construed these sections to mean:

> [I]f a statute be either a special or local law, or both, and comes within any one or
> more of the cases enumerated in section 20, such statute is unconstitutional; if the
> statute be special or local, or both, but does not come within any of the cases
> enumerated in section 20, then its constitutionality depends upon whether a general
> law can be made applicable.

*Beemer*, 45 P.2d at 782.  The *Beemer* court proceeded to assume that the act was local or special and

then examined whether the act attempted to lay down a rule for how bonds could be approved, and

determined that it did not; rather, the act at issue addressed a particular situation that was an "emergency." *Id.* at 782–83.[3]  Because the act did not lay down a rule for the issuance of bonds, but only addressed an emergency, it did not constitute regulating business under section 20. *Id.* at 783–84.  The emergency in *Beemer* was the storage and regulation of flood waters by construction of reservoirs, waterworks, and storage in order to prevent "flood damage." *Id.* at 780–81.  Finding that the act at issue did not fall under the "regulating business" enumeration of Section 20, the Court then proceeded, under its Section 20 and 21 framework, to consider whether any general act already was, or could be made, applicable to the case at hand. *Id* at 784.  If the answer were "yes," then the local/special law would be unconstitutional under Section 21.  Noting the "very strong presumption that the Legislature has a good reason for determining that a general law is not or would not be applicable in some particular cases," the Court found that it could not say "beyond a reasonable doubt" that the act at issue was unconstitutional. *Id.* at 784–85.

Twelve years later, A. E. Cauble, a trustee of the Board of Trustees of Washoe General Hospital, sued Mr. Beemer, who was still the County Clerk and ex-officio Clerk of the Board of County Commissioners of Washoe County. *Cauble*, 177 P.2d at 678.  Beemer had again refused to issue bonds authorized by state legislation, this time to raise money to reconstruct the hospital. *Id.*  Beemer argued that the special legislation violated the Nevada Constitution for several reasons, including the prohibition against regulating county business in Section 20 of Article 4. *Id.* at 681–82.  The Court compared the case to *Gibson v. Mason*, 5 Nev. 283 (1869) and concluded that the special acts in that case "were limited in duration to the completion of the single project and the redemption of the particular bond issue involved, and in no sense related to, or operated to interfere with, the

---

[3]Emergencies are immediate in nature. *See Cauble v. Beemer*, 177 P.2d 677, 687–88 (Nev. 1947) (finding an emergency existed justifying the Legislature's act for the issuance of bonds to fund rebuilding of a general hospital); *Quilici v. Strosnider*, 115 P. 177, 180–81 (Nev. 1911) (finding removal of the Lyon county seat from Dayton to Yerington by the state Legislature to be justified by an emergency where the county courthouse had burned down).

general plan or methods of tax assessment and collection.  So it is in the instant case." *Id.* at 683.
The County argues that this controls the present case, because SB 358 is not a broad and ongoing
change in the zoning powers of Clark County, but rather confined to a special project.  But the
distinction drawn in *Cauble* is not a distinction between the imposition of a broad rule or regulation
versus the imposition of a narrow rule or regulation.  The distinction in *Cauble* is a distinction
between the imposition of any rule or regulation at all versus a direct act by the legislature that lays
down no rule or regulation.  "[Here], there is no attempt to formulate or apply any rule or regulation.
The provisions of the act relate entirely to the particular bond issue for the single hospital
construction and reconstruction project." *Id.*  As opposed to the issuance of bonds for a particular
project, the imposition of any zoning restriction at all in the form of a rule or regulation regulates
county business, even if only in a limited area.  SB 358 plainly imposes a restriction on the way the
County can zone in the Adjacent Area.  It is a lasting regulation of county zoning of indefinite
duration, not a discrete act.

Three years later, taxpayer Joseph F. McDonald sued Mr. Beemer, who still held the same
office.  This time, Mr. Beemer was on the other side of the argument with respect to Sections 20 and
21—and he lost again.  McDonald sued Beemer for a writ of mandamus forcing Beemer to accept
McDonald's filing for his candidacy for public office. *See McDonald v. Beemer*, 220 P.2d 217, 218
(Nev. 1950).  McDonald had attempted to file his papers without designating himself as a resident
of a particular district of Washoe County.  Beemer refused to accept the filing without this
designation, and McDonald sued for a writ of mandamus, including a declaration that the act of the
Nevada legislature dividing Washoe County (and no other county) into two commissioner districts
was unconstitutional under Sections 20 and 21. *See McDonald*, 220 P.2d at 219–20.  The *McDonald*
Court began by laying out the two-part test from *Beemer*. *McDonald*, 220 P.2d at 220 (citing
*Beemer*, 45 P.2d [at 782]).  The Court then noted the broad definition of "county business" it had
used in the past, stating that "'County business' may be defined as covering almost everything that

concerns the administration of the county government." *Id.* (quoting *Singleton v. Eureka County*, 35 P. 833, 836 (Nev. 1894) (Bigelow, J., concurring)).  After quoting Judge Bigelow's concurring opinion at length regarding the paramount importance of uniformity of local government over the merits of particular plans, the *McDonald* Court held the act at issue unconstitutional under Sections 20, 21, 25, and 26 of Article 4 of the Nevada Constitution. *Id.* at 220–21.

A quarter of a century later, the City of Las Vegas sued Clark County over the Metropolitan Cities Incorporation Law and the Urban County Law ("Chapter 648"), seeking declaratory judgment as to the law's constitutionality. *County of Clark v. City of Las Vegas*, 550 P.2d 779, 783 (Nev. 1976).  Chapter 648 purported to allow Las Vegas and certain nearby areas to consolidate governmental services and functions, while Clark County and smaller cities in the county would remain separate. *Id.* at 782–83.  The Clark County District Court declared Chapter 648 unconstitutional in its entirety under Sections 20 and 21, and the Nevada Supreme Court unanimously affirmed. *Id.* at 783–84.  The appellants in that case conceded that the legislation was local or special, but they argued that the constitutional prohibition did not apply to temporary actions.  The Court rejected this argument. *Id*. at 784.  The Court also rejected the argument that the emergency doctrine applied, finding instead that the Chapter 648 legislation directing the manner of election of county officers was itself evidence that a general law could be made applicable throughout the state, which was the test under Section 21. *Id.* at 784–85.

The following year, the City of Sparks sued City Clerk Chloris Goodman to obtain a writ of mandamus forcing her to publish notice of a public hearing pursuant to the state Revitalization and Redevelopment Law ("Chapter 702").  *Goodwin v. City of Sparks*, 566 P.2d 415, 415 (Nev. 1977). Chapter 702 purported to enable "only the cities of Reno and Sparks to develop and finance certain public improvements." *Id.*  The Nevada Supreme Court reversed the district court's ruling that the law was constitutional.  The Court first laid out the *Beemer* framework, then held that because a general law could be made applicable to all cities, the law was unconstitutional under Section 21.

1  *Id*. at 416.  The Court found no emergency "requiring legislative interference by special legislation."

2  *Id*.

3              In this particular case, a general law can be made applicable to the cities.  The
             problems of the deterioration of downtown areas and the need for their improvement
4            is not unique to Reno and Sparks.  Nor are such conditions emergency circumstances
             requiring legislative interference by special legislation. *See Quilici v. Strosnider*, 34
5            Nev. 9, 115 P. 177 (1911).  The Revitalization and Redevelopment Law permits the
             individual cities to determine what projects are needed to revitalize the community.
6            Because the Act applies specifically to Reno and Sparks, it comes within the
             prohibition of Article 4, Section 21, and is void.

7

8  *Id.*  This case, along with *List*, *infra*, directly concerns the management of economic development

9  and local governments' freedom in this area.  The Nevada Supreme Court does not view this kind

10 of situation—gradual deterioration of a neighborhood—as an "emergency" justifying an exception

11 to Sections 20 and 21.  The *Goodwin* Court specifically cited to *Quilici* as an example of an

12 "emergency" authorizing special legislation—a case where removal of the Lyon county seat from

13 Dayton to Yerington by the state Legislature was justified by the county courthouse having burned

14 down. *Quilici*, 115 P. at 180–81.

15     In *State ex rel. List v. Douglas County*, however, the Court held that when the state

16 Legislature's goal was to conserve natural resources in a broad area, and not to achieve local goals,

17 Sections 20 and 21 did not apply. 524 P.2d 1271, 1275 (Nev. 1974).  In *List*, Douglas County

18 challenged an interstate compact (the "Compact"), which had been incorporated into Nevada law,

19 that regulated conduct in the areas surrounding Lake Tahoe and instituted a tax on bordering Nevada

20 counties.  Relying on a California case involving a challenge to the same Compact under similar

21 California constitutional provisions, the Court agreed with the California Supreme Court that where

22 "[t]he water that the agency is to purify cannot be confined within one county or state; . . . [and

23 where t]he wildlife . . . ranges freely from one local jurisdiction to another . . . [o]nly an agency

24 transcending local boundaries can devise, adopt and put into operation solutions for the problems

25 besetting the region as a whole." *Id.* (quoting *People ex rel. Younger v. County of El Dorado*, 487

1   P.2d 1193, 1201 (Cal. 1971)).  The *List* case may be said to stand for a "common natural resource"

2   exception to Sections 20 and 21.  *Id.*

3         Most recently, in 1989, the County of Nye successfully sued the Town of Pahrump, obtaining

4   summary judgment that certain sections of Chapter 682 were unconstitutional under Sections 20 and

5   25 of the Nevada Constitution. *Town of Pahrump v. County of Nye*, 773 P.2d 1224, 1224 (Nev.

6   1989).  The challenged provisions "transfer[red] powers of planning, zoning, land division and

7   building inspection" from the County of Nye to the Town of Pahrump. *Id.*  The Court found that in

8   addition to violating section 25, the law regulated county business in violation of section 20,

9   rejecting the argument that business was only "affected" and not "regulated" by the Legislature's

10  alteration of zoning powers. *See id.* at 1225.  The Court noted that the powers the Legislature had

11  transferred to Pahrump "are broad and ongoing, and they substantially alter the power structure of

12  the county.  They do not relate only to a single item or project of county business, as do the statutes

13  which we have previously held merely 'affect' county business." *Id.*  The County argues that SB

14  358, unlike Chapter 682, only "affects" county business and does not regulate it.  It is true that SB

15  358 only applies to a particular area of the County, and not to the entire County.  But SB 358 is more

16  than a one-time decision pertaining to the Adjacent Areas, analogous to the cases where the Court

17  has upheld one-time issuances of bonds to raise money for special, local purposes.  It is an ongoing

18  regulation of the way the County may zone in the Adjacent Areas.

19        Under the *Beemer* framework, the Court must approach the Motions as follows as to Cause

20  of Action 4.  First, the Court asks whether SB 358 constitutes "regulating county and township

21  business" under Section 20.  If the answer is "no," the Court asks whether a general law "can be

22  made applicable" to the current situation under Section 21.  If the answer to both of these questions

23  is "no," then SB 358 is constitutional under Sections 20 and 21, and the Court must grant summary

24  judgment to Defendants on Cause of Action 4.  But if the answer to either question is "yes," then

25  the Court must proceed to test SB 358 against the "emergency" and "common natural resource"

1  exceptions. If either exception applies, the Court must grant summary judgment to Defendants on

2  Cause of Action 4. But if neither exception applies, then SB 358 is unconstitutional, and the Court

3  must grant summary judgment to Plaintiff on Cause of Action 4. As explained below, the Court

4  finds that SB 358 violates both Sections 20 and 21, and that neither exception applies.

5                  **a.**       **Does SB 358 Regulate County Business?**

6                  Here, SB 358 seeks to tie the hands of Clark County by limiting the

7  density of residential dwelling units it may provide for in the Adjacent Areas and prohibiting the

8  creation or expansion of nonresidential zoning districts. SB 358 § 8. The case most closely on point

9  is *Town of Pahrump*, which held that the alteration by the state Legislature of a county's zoning

10  activities constituted regulating the business of the county under Section 20. 773 P.2d at 1225. The

11  preamble of SB 358 states explicitly, "AN ACT relating to land use planning; *limiting certain*

12  *powers* of planning and zoning that may be exercised by local governments within certain

13  enumerated lands adjacent to the Red Rock Canyon National Conservation Area . . . ." SB 358,

14  pmbl., 2003 Nev. Stat. 595 (emphasis added). As discussed above, SB 358 does not simply enact

15  a one-time project within Clark County. It is an ongoing restriction on the way Clark County may

16  zone in the Adjacent Areas. Because SB 358's alteration of Clark County's ability to zone in the

17  Adjacent Areas institutes a rule or regulation and does not simply effect a discrete act, it falls within

18  Section 20, and is therefore unconstitutional under the Nevada Constitution if it does not fall under

19  either the "emergency" or "common natural resource" exceptions identified in the case law.

20  Attorney General Masto argues that SB 358 is not a special or local law at all, because the

21  Legislature noted that the recreational value of the Adjacent Areas was important to "the State of

22  Nevada as a whole." *Id.* Maybe so, but this finding in the preamble of SB 358 has no bearing on

23  whether the operative part of the law is in fact special or local. SB 358 is in fact a special or local

24  law because it applies only to Clark County by its own terms. The broader concern of the

25  Legislature is relevant to whether the "common natural resource" exception applies and to whether

the law has a rational basis under the Fourteenth Amendment, but it is not relevant to the initial determination of whether the law is in fact special or local.  To argue otherwise conflates effect with motive.

### b.        Can SB 358 Be Made Generally Applicable?

The Court next examines whether SB 358 can be made generally applicable.  Although any set of regulations could in theory be made generally applicable, the test must be applied in such a way that not all legislation will automatically fail the test:

> The existence of a general law covering the basic subject matter does not necessarily establish that such a law is "applicable" for the purposes of section 21. . . . "If we adopt the views so earnestly contended for by appellant it would be impossible for the legislature to pass any local or special law, because all subjects of legislation are more or less general; and to say that when the subject of the law was general a general law would be applicable would prohibit the legislature from passing any local or special law."

*City of Reno v. Washoe County*, 580 P.2d 460, 463 (Nev. 1978) (quoting *Evans v. Job*, 8 Nev. 322, 336 (1873)) (citation omitted).  The *City of Reno* Court then recounted the emergency doctrine and implied a "particular needs" doctrine, under which it upheld the transfer of ownership and administration of the Reno Airport to a newly created Washoe County Airport Authority against a Section 21 challenge. *Id.*[4]  As the County points out, "This court has repeatedly upheld the constitutionality of special or local acts of the legislature [against Section 21 challenges, where] the general legislation existing was insufficient to meet the particular needs of a particular situation . . . ." *Id.* at 463 (quoting *Cauble*, 177 P.2d at 686).

The restrictions that SB 358 applies to the Adjacent Areas could in theory be applied throughout the state.   Although SB 358 was intended to deal with a particular situation—development that is detrimental to the natural and recreational resources in the Adjacent

---

[4]The Court noted that Section 20 did not apply because the transfer did not regulate county business, but only "relat[ed] to, pertain[ed] to, or concern[ed] county business." *Id.* (quoting *Beemer*, 45 P.2d at 782).

1    Areas—this does not implicate the "particular needs" exception because SB 358 could still have

2    been made uniform throughout the state without singling out the Gypsum Mine Property.   For

3    example, SB 358 could have applied the same zoning restrictions to "any land within five miles of

4    a national park" or "any land within ten miles of federal property," or according to some other such

5    county-neutral criteria relevant to preventing development.   Development near natural resources is

6    not the kind of particular need excusing a violation of Section 21.   Although it arises more acutely

7    in particular locations at particular times, the issue of population growth and scarcity of undeveloped

8    land is a more or less general concern.   The problem is in fact so general it has its own name: "urban

9    sprawl."   SB 358 does not apply a solution to this common problem neutrally throughout the state.

10   It applies a solution only to particular land in one particular county.   Therefore, SB 358 violates

11   Section 21.

12           c.      **Does Eventual Damage to the Adjacent Areas from Development
                     or Expansion Constitute an "Emergency?"**

13

14           The present situation does not constitute an "emergency."   Past situations found to have

15   constituted emergencies have been much more immediate in nature than relatively slow, gradual

16   harm from development—which has significantly slowed in the present case since the present

17   lawsuit was filed in 2005.   Moreover, "emergencies" have been limited to natural disasters,

18   unforeseen accidents, and pressing human needs.   The present case cannot be reasonably said to be

19   analogous to a lack of judicial resources due to a courthouse burning down, *see Quilici*, 115 P. at

20   180–81, the lack of a general hospital, *see Cauble*, 177 P.2d at 687–88, or the prevention of flood

21   damage, *see Beemer*, 45 P.2d at 780–81.   Gradual damage to recreational resources, although a

22   legitimate concern, is not comparable in terms of urgency to an existing lack of judicial or hospital

23   services to the residents of a county, or impending damage from flood waters.   Although the

24   emergency in *Beemer* was preventative, and not in response to a particular impending or existing

25   flood, the danger against which the flood management project was directed was an ongoing,

repetitive danger that was sure to be violent and swift whenever a flood came.  Any damage to views, flora, fauna, and the like in the Adjacent Areas due to development will surely be gradual and will not threaten human life or liberty in the same way as a flood or the lack of medical or judicial facilities would.  Therefore, SB 358 is not saved by the "emergency" exception.

### d.    Does the "Common Natural Resource" Exception Apply?

In *List*, the Court held that when the Legislature's goal was to conserve natural resources in a broad area, and not to achieve local goals, Sections 20 and 21 did not apply. 524 P.2d at 1275.  The Court agreed with the California Supreme Court that where "[t]he water that the agency is to purify cannot be confined within one county or state; . . . [and where t]he wildlife . . . ranges freely from one local jurisdiction to another . . . [o]nly an agency transcending local boundaries can devise, adopt and put into operation solutions for the problems besetting the region as a whole." *Id.* (quoting *Younger*, 487 P.2d at 1201).  The preamble to SB 358 notes that "Red Rock Canyon provides numerous recreational opportunities to visitors from both within and without the State of Nevada, including, without limitation, hiking, climbing, bicycling, camping and horseback riding." SB 358, pmbl, 2003 Nev. Stat. 595.  It also states, "If the scenic views and largely rural character of Red Rock Canyon were to be encroached upon by development that is on a large scale or of inappropriate character, the value of Red Rock Canyon with respect to tourism, sightseeing and recreation would be greatly diminished, to the detriment of Clark County and the State of Nevada as a whole." *Id.*, 2003 Nev. Stat. 596.

In *List*, Article 1 of the Compact between Nevada and California listed the following findings and declarations of policy:

> (a) It is found and declared that the waters of Lake Tahoe and other resources of the Lake Tahoe region are threatened with deterioration or degeneration, which may endanger the natural beauty and economic productivity of the region.
> (b) It is further declared that by virtue of the special conditions and circumstances of the natural ecology, developmental pattern, population distribution and human needs in the Lake Tahoe region, the region is experiencing problems of resource use and deficiencies of environmental control.

1
2
3
4
5

   (c) It is further found and declared that there is a need to maintain an equilibrium between the region's natural endowment and its man-made environment, to preserve the scenic beauty and recreational opportunities of the region, and it is recognized that for the purpose of enhancing the efficiency and governmental effectiveness of the region, it is imperative that there be established an areawide planning agency with power to adopt and enforce a regional plan of resource conservation and orderly development, to exercise effective environmental controls and to perform other essential functions, as enumerated in this title.

6   *List*, 524 P.2d at 1272.  This text was added to the Nevada Code.  *See* Nev. Rev. Stat. § 277.200

7   (1973).  The language has since been amended.  The *List* Court agreed with the California Supreme

8   Court's ruling in a similar case that although such special legislation to achieve "local goals" was

9   not permitted, "the Compact was enacted to achieve regional goals in conserving the natural

10  resources of the entire Lake Tahoe Basin, rather than local goals and, therefore, did not offend

11  substantially similar provisions of the California constitution." *List*, 524 P.2d at 1275.  The Court

12  found the following reasoning particularly persuasive:

13
14
15
16
17
18

   The water that the Agency is to purify cannot be confined within one county or state; it circulates freely throughout Lake Tahoe.  The air which the Agency must preserve from pollution knows no political boundaries.  The wildlife which the Agency should protect ranges freely from one local jurisdiction to another.  Nor can the population and explosive development which threatens the region be contained by any of the local authorities which govern parts of the Tahoe Basin.   Only an agency transcending local boundaries can devise, adopt and put into operation solutions for the problems besetting the region as a whole.  Indeed, the fact that the Compact is the product of the cooperative efforts and mutual agreement of two states is impressive proof that its subject matter and objectives are of regional rather than local concern.

19  *Id.* (quoting *Younger*, 487 P.2d at 1201).  The Court held that "the preservation of the region of the

20  Lake Tahoe Basin as a natural resource for the enjoyment of all people sets it apart from the embrace

21  of the commands of [Sections 20 and 21]." *Id.*

22     Here, people from all over Nevada, the United States, and the world allegedly use the

23  Adjacent Areas for recreation; however, there is no interstate compact or need for interstate

24  cooperation.  Unlike the air, water, and wildlife resources in the Tahoe Basin, which straddles

25  multiple counties on both sides of the Nevada–California border, the recreational resources at issue

in the Adjacent Areas are entirely within Clark County, Nevada.[5]  There is no need here for inter-county cooperation, much less interstate cooperation, to avoid inconsistent or ineffective attempts to regulate a common resource.  The resources intended to be protected here lie entirely within the jurisdiction of Clark County.  Moreover, recreational resources that are delimited by terrestrial boundaries are not *ferae naturae*.  In *List*, the nature of the air, water, and wildlife resources at issue made it impossible for regulation without broader cooperation across political boundaries.  Here, the recreational resources at issue consist of access to the land.  Therefore, the "common natural resource" exception does not apply.

Because SB 358 regulates county business and is a special law that could be made applicable to the entire state, and because it does not fall under the "emergency" or "common natural resource" exceptions, SB 358 is unconstitutional under Sections 20 and 21 of the Nevada Constitution.  The Court therefore grants Plaintiff's Motion for Summary Judgment (#42) as to Cause of Action 4.

## 2.      Cause of Action 5 (Inconsistent Legislation, Nev. Const. art. 4, § 25)

Plaintiff argues that SB 258 is invalid under Section 25 of the Nevada Constitution. In the Complaint, Plaintiff based Cause of Action 5 only on Section 20[6] of the Nevada Constitution and alleged inconsistency with various Nevada statutes.  Even if valid under Sections 20 and 21, it might still be invalid under Section 25.  Although Plaintiff has  not previously  pled a claim  under Section 25, the Court grants leave to amend the Complaint *sua sponte*, and considers the issue below.

---

[5]Section 1.7 of SB 358 defines "Adjacent lands" by reference to various numbered townships, without identifying the county or counties to which the townships belong. Presumably they all lie within Clark County, as this is the only county addressed anywhere in SB 358.  *See SB 35*8, pmbl.  There is no evidence in the record contrary to this conclusion, and the maps provided confirm it.

[6]Making the Fifth Cause of Action partially redundant with the Fourth.

Section 25 of Article 4 of the Nevada Constitution reads, "The Legislature shall establish a system of County and Township Government which shall be uniform throughout the State." Nev. Const. art. 4, § 25.  Plaintiff argues that SB 358 is unconstitutional under Section 25 because it alters the zoning powers of Clark County without altering the zoning powers of other Nevada counties, in violation of the requirement of uniformity.  Plaintiff also argues that SB 358 makes it "impossible for Clark County to comply with its statutory mandates" because the enabling statutes, Nev. Rev. Stat. § 278.030 *et seq.*, require Clark County to prepare and adopt a Master Plan as the basis for all development.

Statutes have been held invalid under Section 25 when they purported to transfer powers of planning, zoning, land division, and building inspection away from a county to an unincorporated town:

> This court has previously defined a "system of government," as used in the context of section 25, as consisting of "the powers, duties, and obligations placed upon [a] political organization."  Since zoning and planning fall within the "powers, duties and obligations placed upon [a] political organization," they are precisely the type of activities that section 25 was intended to regulate.  Because Chapter 682 delegates these powers away from Nye County to the unincorporated Town of Pahrump in a unique manner, one not utilized by other counties, it destroys the uniformity of the system of government among the counties.

*Town of Pahrump*, 773 P.2d at 1224–25.  Because SB 358 purports similarly to take zoning powers away from Clark County, leaving it with a set of rules unique to itself and not utilized by other counties, it also allegedly "destroys the uniformity of the system of government among the counties." *See id.*

The County responds that "[a]ny conflict between special and general laws must, if the general law is constitutional, be resolved in favor of the special law." *City of Reno*, 580 P.2d at 463 (citing *Ronnow v. City of Las Vegas*, 65 P.2d 133 (1937)).  This argument indeed quickly disposes of Plaintiff's claim that SB 358 is infirm because it is inconsistent with general legislation.  However, it does not dispose of the Section 25 claim.  *Ronnow* did not involve a Section 25

1  challenge, or any constitutional challenge at all, but rather competing statutes.  *Ronnow* was not a
2  judicial review case, but a statutory construction case.  Furthermore, the County's citations from
3  *City of Reno* involve that case's discussion of a Section 21 challenge. That case involved no Section
4  25 challenge.

5       *Town of Pahrump* is on point.  It involved a unique alteration of a county's zoning powers
6  by the state. Such is the case here. Although in the present case powers are not transferred from the
7  County to a town, the state has restricted the County's powers in a unique way.  The facts that the
8  restrictions only apply to a particular portion of the County and are related to a particular need are
9  not enough to avoid infirmity under Section 25.  If it were, the Legislature could apply non-uniform
10  local zoning rules throughout the state and justify its actions by pointing out that each particular
11  legislative act applied only to a small part of each county and was related to a particular local need
12  in each county.  And this would surely be the case—after all, the purpose of zoning is to closely
13  control local development according to particularized local needs.  But Section 25 as interpreted in
14  *Town of Pahrump* prevents the state from interfering with a county's or township's ability to zone
15  by imposing unique regulations.  In conclusion, SB 358 is unconstitutional under Section 25 of
16  Article 4 of the Nevada Constitution, and the Court grants Plaintiff's Motion for Summary Judgment
17  (#42) as to Cause of Action 5.

18       **B.     Defendants' Motions for Summary Judgment on Causes of Action 1 and 2**

19            **1.     Equal Protection**

20       Plaintiff asserts that Defendants misused their governmental powers and purposefully singled
21  its property out for different treatment based upon illegitimate reasons in order to deflate its value
22  and make Plaintiff a "willing seller" to the government.  Defendants claim, on the other hand, that
23  both SB 358 and CCO 2914 further legitimate government purposes to preserve the status quo and
24  protect open spaces near the RRCNCA and are rationally related to those purposes.  Plaintiff does
25  not assert that it has been denied a fundamental right and does not claim to be part of a suspect class.

1   Rather, Plaintiff asserts that it has been impermissibly singled out and subjected to "arbitrary and

2   malicious" laws that cannot withstand rational-basis scrutiny because the government's stated

3   interests are pretextual.

4          "Although state action that does not implicate a fundamental right or suspect classification

5   passes constitutional muster under the equal protection clause so long as it bears

6   a rational relation to a legitimate state interest, 'the rational relation test will not sustain conduct

7   by state officials that is malicious, irrational, or plainly arbitrary.'" *Armendariz v. Penman*, 75

8   F.3d 1311, 1326 (9th Cir. 1996) (citations omitted); *see also City of Cleburne v. Cleburne Living*

9   *Center*, 473 U.S. 432, 440 (1985).  It is also possible to maintain an equal protection claim as a

10  "class of one" where a plaintiff alleges that he has been "intentionally treated differently from others

11  similarly situated and that there is no rational basis for the difference in the treatment." *Village of*

12  *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  The Ninth Circuit has noted that it will not treat

13  what is in substance a garden-variety, rational-basis equal protection claim as a "class of one" equal

14  protection claim. *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008) (holding that

15  a plaintiff's claim of unequal treatment based on its perceived associations with conservationists and

16  newcomer status was based on a classification, not unique treatment).  In such cases, a court must

17  look closely to see if the complaint is based on "unique treatment" versus a "classification." *See id.*

18  "Class of one" claims must assert that discriminatory treatment was intentionally directed only at

19  the plaintiff. *N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008).  State action

20  survives rational basis review if "there is any reasonably conceivable state of facts that could

21  provide a rational basis for the challenged law." *Merrifield v. Lockyer*, 547 F.3d 978, 989 (9th Cir.

22  2008) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)) (internal quotation marks

23  omitted).

24          With respect to SB 358, the Nevada Legislature made specific findings that the value of Red

25  Rock Canyon would be diminished, and it would be detrimental to the County and State "if the

1  scenic views and largely rural character of Red Rock Canyon were to be encroached upon by

2  development that is on a large scale or of inappropriate character . . . ." SB 358, pmbl., 2003 Nev.

3  Stat. 596.  The preservation of scenic and recreational areas is a legitimate state purpose providing

4  a rational basis for zoning restrictions. *See, e.g.*, *S. County Sand & Gravel Co. v. Town of S.*

5  *Kingstown*, 160 F.3d 834, 836–37 (1st Cir. 1988) (citing *Berman v. Parker*, 348 U.S. 26, 33 (1954))*;*

6  *Ybarra v. Town of Los Altos Hills*, 503 F.2d 250, 254 (9th Cir. 1974) (preservation of a rural

7  environment).  And even if Plaintiff were the only landowner affected by SB 358 or CCO 2914,

8  those laws would still survive rational basis scrutiny in this case in the absence of evidence of

9  animus towards Plaintiff.  Plaintiff admits there are other landowners within the Adjacent Areas, but

10  claims that its land is the only land "actually impacted," because the other lands have already been

11  developed. (#1 ¶ 23).  The fact that Plaintiff is the only one harshly affected may be simply a matter

12  of circumstance stemming from these two governments' focus on particular lands, not on particular

13  persons.  The Fourteenth Amendment does not prohibit arbitrary discrimination between lands, but

14  only between persons.

15      However, Plaintiff cites to specific portions of the legislative history of SB 358 that

16  substantiate its claim that the legislature directly targeted its particular property.  State Senator Dina

17  Titus, a co-sponsor of SB 358, wrote a letter, dated May 6, 2003, to the Clark County

18  Commissioners expressing her support for their resolution advocating the purchase of the Gypsum

19  Mine Property with the intent to subsequently transfer those lands to BLM to be managed as part

20  of the RRCNCA.  In that letter, she stated:

21          I am writing in full support of your proposed resolution advocating the
        acquisition of the former James Hardie gypsum mine lands and subsequent transfer
22      of those lands, once restored, to the BLM to be managed as part of the Red Rock
        Conservation Area.  You are to be commended for your leadership and perseverance
23      on this important issue.
            As you know, I am sponsoring a companion bill in the legislature, SB 358,
24      which would freeze the current rural zoning in the area while your proposed
        acquisition is being negotiated.  This is an important intermediate step for two
25      reasons: *First, the current owner is much more likely to be a willing seller if he is*

*denied the ability to more densely develop the land.*  Second, such limitations will prevent the fair market value from skyrocketing and thus save taxpayer dollars.

I believe this three-pronged, county–state–federal, collaborative approach to preserving Red Rock is the appropriate way to proceed . . . .

(#58, Ex. 9 (emphasis added)).

Senator Titus reiterated her position during her testimony before the relevant state legislative committee.  She noted that Clark County hoped to buy the Gypsum Mine Property, and SB 358 would lock in the existing zoning.  "Locking in existing zoning will more likely make the owner a willing seller, and will keep the fair market value from skyrocketing, which will cost less in public dollars." (#58, Ex. 11).  Because of the above, the Court denied Defendants' motion to dismiss the equal protection claim as to SB 358 under a "class of one" theory. (#29).  This was enough to make the claim plausible.

With respect to CCO 2914, its stated purposes include the preservation of open spaces as well as the prevention of overburdening infrastructure needs such as transportation facilities.  Plaintiff again asserts that, while CCO 2914 may be written to include a large area, in reality the overlay district effectively applies only to Plaintiff's property, because all other properties are expressly exempted or already developed.  Because of this, the Court denied Defendants' motion to dismiss the equal protection claim as to CCO 2914 under a "class of one" theory.  The Court must now determine if Defendants are entitled to summary judgment as a matter of law under the "class of one" equal protection claims against SB 358 and CCO 2914 based on the evidence the parties have adduced.

Defendants are not entitled to summary judgment on the equal protection claim.  Defendants note that both SB 358 and CCO 2914 include findings that development in the Adjacent Areas would be detrimental to the wildlife habitat, scenery, and recreational value of the area.  This is enough for Defendants to show a legitimate government purpose and meet their initial burden on a motion for summary judgment.  Plaintiff does not refute that there may be a legitimate interest in

1   protecting the land from development, but argues that this was a pretext to single it out and put

2   pressure on it to sell the land by destroying its value.  The evidence it adduces supports this.

3   Plaintiff has met its shifted burden of establishing a genuine issue of material fact.

4          The first clue that might cause an observer to raise an eyebrow is the *Shaw v. Reno*-like

5   cartographical anomaly in this case.  *See* 509 U.S. 630 (1993).  Plaintiff owns 94.3% of the 8.5% of

6   the undeveloped Adjacent Areas covered by SB 358 and CCO 2914 that are privately owned.  (*Id.*,

7   Slater Decl. ¶¶ 7–8).  This is certainly enough to cause suspicion, without more.  But Plaintiff

8   provides much more.  Plaintiff adduces evidence that the real purpose of SB 358 and CCO 2914 was

9   in fact to single out Plaintiff to make it a willing seller of the Gypsum Mine Property.  Exhibit 9 is

10  a letter from State Senator Dina Titus to the Clark County Commissioners indicating that "the

11  current *owner* [singular] is much more likely to be a willing seller if *he* is denied the ability to more

12  densely develop the land." (#58, Ex. 9 (emphases added)).  Titus admitted authoring and signing the

13  letter in her deposition.  (*Id.*, Ex. A, at 9:24–10:4).  Plaintiff also adduces evidence from an April 16,

14  2003 Board zoning meeting that the goal of the legislation was the purchase of the Gypsum Mine

15  Property in particular, and no other property.  (*Id.*, Ex. 18).  The Board later adopted a resolution to

16  purchase the Gypsum Mine Property.  (*Id.*, Ex. 8).  On May 10, 2003, Senator Titus testified in favor

17  of SB 358 in the state Assembly, arguing that "He [Mr. James Rhodes] can't make any money on

18  1,200 homes, if that's all he can build, so maybe he will never build any houses." (*Id.*, Ex. 12, at

19  1000818).  Plaintiff has adduced evidence sufficient to prevent summary judgment that SB 358 and

20  CCO 2914 were passed in order to single it out and make him a willing seller of the Gypsum Mine

21  Property or to depress the value of the Property so that it could not profit from it.  There is a genuine

22  issue of material fact concerning whether these laws specifically targeted the Property arbitrarily or

23  maliciously.

24

25

1

### 2.    Substantive Due Process

2       Plaintiff alleges a substantive due process violation "because the action of defendants

3  is capricious and motivated by the improper purpose of devaluing the Plaintiff's property." (#1 ¶ 45).

4  In *Armendariz*, the Ninth Circuit explained that "recent jurisprudence restricts the reach of the

5  protections of substantive due process primarily to liberties 'deeply rooted in this Nation's history

6  and tradition.'  Thus, the Fourteenth Amendment protects against a State's interferences with

7  'personal decisions relating to marriage, procreation, contraception, family relationships, child

8  rearing, and education,' as well as with an individual's bodily integrity." 75 F.3d at 1319 (citations

9  omitted).  Plaintiff does not articulate a claim of infringement upon one of these traditionally

10  fundamental interests. Rather, Plaintiff's claim is based upon economic interests.

11       Defendants assert that any potential substantive due process claim is preempted by Plaintiff's

12  more specific and explicit takings and equal protection claims.  The Supreme Court

13  has held that, where a particular Constitutional amendment "provides an explicit textual source

14  of constitutional protection . . . that Amendment, not the more generalized notion of 'substantive

15  due process,' must be the guide for analyzing [a plaintiff's] claims." *Graham v. Connor*, 490 U.S.

16  386, 395 (1989); *see also Armendariz*, 75 F.3d at 1325–26.  The Ninth Circuit, in *Armendariz*, held

17  that the Fifth Amendment preempts substantive due process challenges to land

18  use regulations. 75 F.3d at 1321–24.  Additionally, in *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d

19  936, 949–50 (9th Cir. 2004), the Court noted that a substantive due process challenge brought in the

20  context of regulation of real property uses might not be "viable in this circuit."

21       Defendants further rely upon Justice Scalia's concurrence in *City of Cuyahoga Falls v.*

22  *Buckeye Cmty.*, 538 U.S. 188 (2003), directing the preemption of a substantive due process claim

23  when equal protection can be used.  He stated:

24       The judicially created substantive component of the Due Process Clause protects,
         we have said, certain "fundamental liberty interest[s]" from deprivation by the
25       government, unless the infringement is narrowly tailored to serve a compelling

1   state interest. *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).  Freedom

2   from delay in receiving a building permit is not among these "fundamental liberty
    interests."  To the contrary, the Takings Clause allows government confiscation

3   of private property so long as it is taken for a public use and just compensation
    is paid; mere regulation of land use need not be "narrowly tailored" to effectuate

4   a "compelling state interest."  Those who claim "arbitrary" deprivations of
    nonfundamental liberty interests must look to the Equal Protection Clause, and

5   *Graham v. Connor*, 490 U.S. 386, 395 (1989), precludes the use of "'substantive
    due process'" analysis when a more specific constitutional provision governs.

6   *Id.* at 200–01 (Scalia, J., concurring) (alteration in original).

7        On the other hand, Plaintiff, relying on *Lingle*, argues that the Court is no longer bound

8   by the Ninth Circuit's holding in *Armendariz*, and that its substantive due process claim is not

9   preempted.  The majority in *Lingle* stated:

10   An inquiry of this nature has some logic in the context of a due process challenge,
     for a regulation that fails to serve any legitimate governmental objective may be so

11   arbitrary or irrational that it runs afoul of the Due Process Clause.

12       . . . .

13   [The Takings Clause] is designed not to limit the governmental interference with
     property rights per se, but rather to secure compensation in the event of otherwise

14   proper interference . . . .  Due process violations cannot be remedied under the
     Takings Clause, because if a government action is found to be impermissible—for

15   instance because it fails to meet the 'public use' requirement or is so arbitrary as to
     violate due process—that is the end of the inquiry.  No amount of compensation can

16   authorize such action.

17   544 U.S. at 542–43 (citations omitted).  Justice Kennedy, in concurrence, specifically opined that

18   the *Lingle* "decision does not foreclose the possibility that a regulation might be so arbitrary or

19   irrational as to violate [substantive] due process.  The failure of a regulation to accomplish a

20   stated or obvious objective would be relevant to that inquiry." *Id.* at 548–49 (Kennedy, J.,

21   concurring) (citation omitted); *see also Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882

22   F.2d 1398, 1407 (9th Cir. 1989), *overruled on other grounds by Armendariz*, 75 F.3d 1311.

23        Indeed, the Ninth Circuit's recent decisions in *Action Apartment Ass'n, Inc. v. Santa Monica*

24   *Rent Control Bd.*, 509 F.3d 1020 (9th Cir. 2007) and *Crown Point Dev., Inc. v. City of Sun Valley*,

25   506 F.3d 851 (9th Cir. 2007) provide new clarity on the issue of preemption.  The court in *Crown*

1  *Point* found that, "it is no longer possible in light of *Lingle* . . . to read *Armendariz* as imposing a

2  blanket obstacle to all substantive due process challenges to land use regulation." 506 F.3d at 856.

3  The court stated:

4          In this, *Lingle* pulls the rug out from under our rationale for totally precluding
        substantive due process claims based on arbitrary or unreasonable conduct.  As the

5      Court made clear, there is no specific textual source in the Fifth Amendment [taking
        clause] for protecting a property owner from conduct that furthers no legitimate

6      purpose.    Thus, the *Graham* rationale no longer applies to claims that a
        municipality's actions were arbitrary and unreasonable, lacking any substantial

7      relation to the public health, safety, or general welfare.

8  *Id.* at 855.

9          Similarly, in *Action Apartment*, the court held that the *Lingle* decision effectively overruled

10  the portion of *Squaw Valley* that construed *Armendariz* and *Graham* to create a

11  "blanket prohibition" against any substantive due process claim based on a deprivation of real

12  property.  The court stated:

13          As we recently recognized, that specific logic cannot survive the Supreme
        Court's decision in *Lingle*.  In *Lingle*, the Court specifically held that an arbitrary and

14      irrational deprivation of real property, although it would no longer constitute a
        taking, might be "so arbitrary or irrational that it runs afoul of the Due Process

15      clause."  Given that holding, it must be true that the *Armendariz* line of cases can no
        longer be understood to create a "blanket prohibition" on all property-related

16      substantive due process claims.    After *Lingle*, "the Fifth Amendment does not
        invariably preempt a claim that land use action lacks any substantial relation to the

17      public health, safety, or general welfare," regardless of anything *Squaw Valley* said
        to the contrary.

18

19  509 F.3d at 1025 (citations omitted).  Consequently, the Court ruled that Plaintiff in the present case

20  has articulated a cognizable substantive due process claim that is not preempted. (#29).

21          Since the Court issued the Order (#29), the Ninth Circuit has issued another opinion on the

22  burden a Plaintiff must meet to succeed on a substantive due process claim for land use regulation.

23  The burden is very high:

24          The Supreme Court has "long eschewed ... heightened [means–ends] scrutiny when
        addressing substantive due process challenges to government regulation" that does

25      not impinge on fundamental rights.  Accordingly, the "irreducible minimum" of a

1
2
3

> substantive due process claim challenging land use action is failure to advance any
> legitimate governmental purpose.  The "exceedingly high burden" required to show
> that Spokane or its employees behaved in a constitutionally arbitrary fashion has not
> been met here.

4   *Shanks v. Dressel*, 540 F.3d 1082, 1088 (9th Cir. 2008) (noting that an error in law in issuing a

5   building permit, resulting in harm to a neighbor, would not constitute arbitrary or irrational action

6   by a governmental body) (citations omitted).  In the context of a permitting decision, "arbitrary in

7   the constitutional sense" means "egregious" conduct or an "abuse of power" with no reasonable

8   justification. *Id.* (citations omitted).  "[B]arring irrational or arbitrary conduct, Congress can adjust

9   the incidents of our economic lives as it sees fit. . . . Indeed, the Supreme Court has not blanched

10  when settled economic expectations were upset, as long as the legislature was pursuing a rational

11  policy." *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1086 (9th Cir. 2001) (citations omitted).  The Court

12  must now determine if Defendants are entitled to summary judgment as a matter of law for such a

13  substantive due process claim against SB 358 and CCO 2914 based on the evidence the parties have

14  adduced.

15      Defendants are entitled to summary judgment on the substantive due process claim. Plaintiff

16  cannot reasonably argue that either the Legislature or the County "fail[ed] to advance any legitimate

17  government purpose" through SB 358 or CCO 2914. *Shanks*, 540 F.3d at 1088.  The legislation has

18  the legitimate purpose of protecting the Property from development.  This is precisely why

19  Defendants met their initial burden on the equal protection claim.  There is nothing irrational or

20  arbitrary about the government's desire to acquire property or to protect it from development.

21  Plaintiff argues that "[a] government desire to allow property to be acquired is not a legitimate basis

22  for treating desired properties *differently* from others." (#57 at 37:5–6 (emphasis added)).  But this

23  conflates equal protection with substantive due process.  To the extent Plaintiff brings a substantive

24  due process claim because he was "singled out," this is already a part of his equal protection claim,

25  which survives summary judgment.

1

**CONCLUSION**

2          IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment (#42) as to the

3   Fourth and Fifth Causes of Action is GRANTED.  Defendants' Motions for Summary Judgment

4   (#43, #44) as to the First Cause of Action are DENIED.  Defendants' Motions for Summary

5   Judgment (#43, #44) as to the Second Cause of Action are GRANTED.

6          DATED:          November 24, 2009

7

8                                        _____
                                         Robert C. Jones
9                                        United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25